STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

10-846

SHERWOOD RANSOM

VERSUS

BARRY SHERWOOD RANSOM

**********

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF LAFAYETTE, NO. C-20061671
HONORABLE DURWOOD W. CONQUE, DISTRICT JUDGE

**********

MARC T. AMY
JUDGE

**********

Court composed of Oswald A. Decuir, Marc T. Amy, and J. David Painter, Judges.

AFFIRMED.

Jack Derrick Miller
Post Office Box 1650
Crowley, LA   70527-1650
(337) 788-0768
COUNSEL FOR DEFENDANT/APPELLEE:
    Barry Sherwood Ransom

Warren D. Rush
Rush, Rush & Calogero
Post Office Box 53713
Lafayette, LA   70505-3173
(337) 235-2425
COUNSEL FOR PLAINTIFF/APPELLANT:
    Sherwood Ransom

AMY, Judge.

The plaintiff brought suit alleging that the defendant personally used funds which were to be used to start a new business. The trial court found in favor of the defendant. The plaintiff appeals. For the following reasons, we affirm.

**Factual and Procedural Background**

The plaintiff, Sherwood Ransom, brought suit against the defendant, his son, Barry Ransom, alleging that the defendant misappropriated certain business funds for personal expenses. Prior to the current dispute, the defendant worked for the plaintiff at Lafayette Well Testing, a business that the plaintiff owned. In 2004, the plaintiff sold Lafayette Well Testing to Cetco Services with a two-year non-competition agreement.

The plaintiff alleges that sometime after the sale of Lafayette Well Testing, he and the defendant entered into a verbal agreement to start a new oil testing business. In November of 2005, the plaintiff took out a $200,000.00 loan from the bank which was deposited into an account in the name of S&L Farm, L.L.C., another business the plaintiff owned. S&L Farm, as an agent for the plaintiff, transferred $150,000.00 to the defendant's personal checking account. The plaintiff asserts that he and the defendant agreed that the $150,000.00 was to be used to buy oilfield equipment and the remaining money would be used for operational expenses.

Daniel Lyons, the owner and president of Lion's Oilfield Equipment Service Incorporated, testified that he was contacted by a friend, Steve Kent, who informed him he was going to be sending his partner to the store to order certain testing equipment. In December of 2005, the defendant went to Mr. Lyons's store and ordered two oil well separators. The equipment delivery ticket entered into evidence

provided that the equipment was invoiced to Point Coupee Energy[1] at the plaintiff's personal address. Mr. Lyons testified that when the equipment was ready, he attempted to contact the defendant for payment, but it was to no avail. He related that he then contacted Mr. Kent about the equipment which subsequently resulted in a meeting with the plaintiff. Mr. Lyons explained that in February of 2006, the plaintiff came to his store and gave him a check for $122,620.96 for one of the separators in addition to a $6,003.20 check for interest due on the late payment of the separators. Mr. Lyons testified that Mr. Kent paid for the other ordered separator.

On April 5, 2006, the plaintiff filed suit against the defendant. In that petition, the plaintiff stated that the "cause of action was based on misappropriation by Defendant of $150,000.00 cash delivered by Petitioner to Defendant for the purpose of depositing the funds into the bank account of Ransom Well Testing's[2] [sic] to then in turn be paid to Daniel Lions [sic] for well testing equipment." The defendant answered, admitting that the plaintiff had transferred the $150,000.00 to his account. However, he asserted that the money was a gift from his father. Further, the defendant contended that he ordered the equipment from Mr. Lyons on behalf of his father because his father was prohibited from competing against Cetco pursuant to the terms of sale between the two. The defendant denied ever having any agreement to go into business with the plaintiff, Steve Kent, or the both of them.

---

[1] The plaintiff testified that Point Coupee Energy was a company owned by Steve Kent. When confronted with the invoice, the defendant stated that he had "never seen this invoice. I just ordered the equipment." The defendant denied knowing anything about Point Coupee Energy.

[2] In a pretrial memorandum, the plaintiff admitted that he was mistaken in a deposition when he testified that a new limited liability corporation, Ransom Well Testing, LLC, was formed for the purposes of starting a new business. The record reveals that the defendant formed a company named Ransom Well Testing, LLC, in Texas in 1998, however, the defendant testified that the company never operated.

After a bench trial, the trial court found in favor of the defendant, finding that the plaintiff failed to prove the defendant misappropriated or illegally converted the $150,000.00.

The plaintiff appeals, asserting:

1.  The trial court erred in not finding that Barry misappropriated $150,000.00 to his personal use by breaching a verbal agreement with Sherwood to utilize the $150,000.00 transferred to him for a well testing business.

2.  The trial court erred in not restoring Sherwood funds in the amount of $150,000.00 because said monies were not owed for any obligation, as a gift or bonus to Barry.

3.  The trial court erred in not finding that Barry breached his obligation to Sherwood by not purchasing equipment to begin a business and therefore Sherwood is entitled to recover damages from Barry's failure to perform.

4.  The trial court erred in failing to find that there was sufficient evidence and corroborating circumstances to prove that Sherwood and Barry had a verbal agreement to start their new well testing business.

## Discussion

The plaintiff argues that the trial court erred in finding that there was insufficient evidence to prove that the parties had a verbal agreement concerning the use of the $150,000.00.

"A party who demands performance of an obligation must prove the existence of the obligation." La.Civ.Code art. 1831. If the value of an oral contract is in excess of $500.00, as it is here, the contract must be proved by at least one witness and other corroborating circumstances. La.Civ.Code art. 1846. General corroborating circumstances must be shown; independent proof of every detail is not needed. *Ashy v. Trotter*, 04-612 (La.App. 3 Cir. 11/10/04), 888 So.2d 344. The determination of

3

whether there is sufficient corroborating circumstances to establish an oral contract

is a question of fact subject to the manifest error standard of review. *Id.*

In its oral reasons for judgment, the trial court stated, in pertinent part:

I've got the plaintiff, Mr. Sherwood Ransom, saying conclusively: This was not a gift. This was a business deal. It wasn't [the defendant's] money to use, and he used it. I've got Mr. Barry Ransom saying it was not a business deal. There never was a business deal. There never was another company. I was never involved in anything. This was purely a gift. I didn't - - I wasn't at the bank. I didn't have anything to do with it. He promised me this, and that's the way it was.

. . . .

I don't doubt that there was some discussions at some point maybe between him and some of his buddies, like Mr. Kent, and perhaps even Mr. Ransom. I'm sure there were many conversations that took place that people don't recall exactly where there may have been some discussion of some day getting back into it [the oilfield testing business] and having them involved, but it never really came to pass.

I think that maybe, when Mr. Ransom went to the bank that day, he was thinking about this $150,000 just like he's thought of all of the bonuses and advantages that he's given to his son over the years, that he was going to be the money man and that eventually his son would have to earn whatever it was he was getting; but I don't think his son or anyone else was made aware of that. I don't think anybody else knew what might have been going on in Mr. Ransom's mind at that point.

. . . .

All of the indications to me are that, whatever happened, the evidence here today does not prove to me by a preponderance, more probably than not, that somehow or other $150,000 got put into Mr. Barry's account and that he spent it knowing full well it wasn't his to spend. It may not have been, but the proof of that is not here, and that's what we're about here in the courtroom.

So I don't find that there's been sufficient proof to tip the scales in favor of the plaintiff that any money was misappropriated or converted illegally. I'm going to stay away from even saying what it was, whether it was a gift or whatever else it might have been.

At trial, the plaintiff testified that he and the defendant agreed, with Mr. Kent,

to start a new business. He related that he and the defendant went to the bank

4

together to get the loan which they agreed would be used to purchase equipment and fund other operational expenses. He stated that Mr. Lyons contacted him asking him for payment on the equipment. The plaintiff testified that he tried to contact the defendant, but the defendant did not return his calls. He related that he had had no contact with the defendant since the meeting at the bank.

The plaintiff also offered the testimony of Ronald Arceneaux, a relationship manager for the plaintiff's bank. Mr. Arceneaux testified that the plaintiff obtained the $200,000.00 loan secured by a collateral mortgage, that the loan check was made payable the plaintiff, and it was deposited in an account named S&L Farm, L.L.C., a business owned by the plaintiff. Mr. Arceneaux further testified that on November 23, 2005, the plaintiff transferred $150,000.00 to an account in the name of the defendant. Mr. Arceneaux testified that he had never met the defendant and that the defendant was not present with the plaintiff when he obtained the loan.

Mr. Lyons also testified for the plaintiff. At trial, he related that he was first contacted by Mr. Kent and was told that Mr. Kent and the defendant were going into business together. He stated that he was later told by the plaintiff that Mr. Kent, the plaintiff, and the defendant were all going into business together. Counsel for the defendant confronted Mr. Lyons at trial with his deposition testimony wherein he stated that he believed Mr. Kent and the plaintiff were going into business together.

The defendant testified that throughout the years of working for the plaintiff, the plaintiff gave him several bonuses which he considered as gifts.[3] He testified that the $150,000.00 was transferred to him per the plaintiff's promise that he would give

_____

[3] The defendant testified that the plaintiff had given him a Harley Davidson motorcycle valued at $18,000.00, $20,000.00 for the down payment on a house, $30,000.00 for a down payment on a second house, in addition to a pickup truck, shotguns, rifles and a deer lease.

the defendant some money from the proceeds of his sale of Lafayette Well Testing. He testified that the plaintiff "told me that I could buy me a pickup and pay off some bills" with the $150,000.00. The defendant confirmed that he ordered the equipment from Mr. Lyons, however, he denied that he made any agreement to start a business with the plaintiff or Mr. Kent. He related that he purchased the equipment because his father was prohibited from doing so under the non-compete agreement. The defendant testified that the relationship with his father soured in February of 2006 because he "was working for Cetco, and I got a non-compete clause, and he got mad because I wouldn't quit [Cetco] and come work for him."

Here, the plaintiff points to certain evidence he asserts proves that he and the defendant had an agreement as to the $150,000.00. First, he contends that Mr. Lyons's testimony corroborates his testimony that he and the defendant agreed to begin a new business venture. Further, he asserts that the facts show that he provided the funds to the defendant approximately three weeks prior to the defendant ordering the equipment. He contends that the amount transferred was "obviously determined by [the plaintiff] to be sufficient to purchase the first set of equipment which cost $122,620.96 and he estimated a truck at that time would cost around $25,000.00 and for other operational expenses."

After review of the record, we find no manifest error in the trial court's determination that the plaintiff failed to carry his burden of proof. As explained above, "[a] party who demands performance of an obligation must prove the existence of the obligation." La.Civ.Code art. 1831. If the value of an oral contract is in excess of $500.00, as it is here, the contract must be proved by at least one witness and other corroborating circumstances. La.Civ.Code art. 1846. The corroborating

6

circumstances must come from a source other than the plaintiff. *Suire v. Lafayette City-Parish Consol. Government*, 04-1459 (La. 4/12/05), 907 So.2d 37.

In regard to Mr. Lyons's testimony, the trial court stated:

> Mr. Lyons testified that he sold the equipment to Pointe Coupee Energy, that it was ordered by Barry Ransom, and it was paid by check from Mr. - - from the plaintiff, Mr. Sherwood Ransom. And he said he believed that the plaintiff, the defendant, and Steve Kent were going into business together. I don't think he was too sure about that. But where is Steve Kent?

> . . . .

> I imagine he concluded that [that the plaintiff, defendant and Mr. Kent were involved in some kind of business deal] from the fact that Mr. Barry Ransom ordered the equipment and Pointe Coupee was billed for it. I guess he put two and two together, but I never heard him say anything about - - I never heard anybody say anything about what was the $150,000 for.

A review of the record reveals no corroborating evidence as the agreement between the plaintiff and the defendant as to the $150,000.00. Mr. Lyons testified as to whether he believed the plaintiff, the defendant, and Mr. Kent were going to begin a new business. However, he offered no testimony indicating he had any knowledge of the $200,000.00 loan or the $150,000.00 transfer. The bank employee testified as to knowledge of the $200,000.00 loan, but did not relate that he had any knowledge as to what the loan was to be used for or as to the plaintiff's intent in transferring the money to the defendant.

The plaintiff contends that the amount transferred was "obviously determined by [the plaintiff] to be sufficient to purchase the first set of equipment which cost $122,620.96 and he estimated a truck at that time would cost around $25,000.00 and for other operational expenses." However, as noted in the trial court's reasons for

7

judgment, there was no evidence that the plaintiff's "obvious determination" as to the purpose and amount of the loan was communicated or agreed upon by the defendant.

The only evidence submitted as to the agreement between the plaintiff and the defendant in regard to the $150,000.00 is the plaintiff's uncorroborated testimony. As such, we find no manifest error in the trial court's judgment dismissing the plaintiff's claims.

## DECREE

For the foregoing reasons, we affirm the trial court's judgment in favor of the defendant. All costs associated with the proceeding are assessed against the plaintiff-appellant, Sherwood Ransom.

**AFFIRMED.**